# UNITED STATES
## COURT OF FEDERAL CLAIMS

YOLANDA QUIMBY, ET AL.,    )
                     )
        Plaintiffs,    )
                     )
v.                    ) Docket No. 02-101 C
                     )
UNITED STATES,        )
                     )
        Defendant.     )

<u>Live Tape</u>

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on October 19, 2012.)

Pages: 1 through 36

Place: Washington, D.C.

Date: October 18, 2012

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YOLANDA QUIMBY, ET AL.,      )
                             )
          Plaintiffs,        )
                             )
v.                           ) Docket No. 02-101
                             )
UNITED STATES,               )
                             )
          Defendant.         )

                             Thursday,
                             October 18, 2012


Live Tape

          (The following transcript was transcribed from a
digital recording provided by the United States Court of
Federal Claims to Heritage Reporting Corporation on
October 19, 2012.)

          BEFORE:  HONORABLE VICTOR J. WOLSKI
                   Judge

          APPEARANCES:

          On Behalf of Plaintiff:

          IRA M. LECHNER, Esquire
          Katz & Ranzman, P.C.
          4530 Wisconsin Avenue, N.W., Suite 250
          Washington, D.C.  20016
          (858) 864-2258

          On Behalf of Defendant:

          HILLARY ADRIENNE STERN, Esquire
          U.S. Department of Justice
          Civil Division
          Commercial Litigation Branch
          1100 L Street, N.W., 8th Floor
          Washington, D.C.  20530
          (202) 616-0177

1          P R O C E E D I N G S

2                                              (2:01 p.m.)

3          THE COURT:  Good afternoon.  As you no doubt

4     know, we are all here to discuss the motion to approve

5     the settlement in the Quimby class action case after

6     all these years and also the motion on the attorney's

7     fees portion of the matter.  I guess it's Plaintiffs'

8     motion, so we'll start with counsel for the Plaintiff.

9     And actually please, both sides, first state your

10    appearance for the record, beginning with Plaintiffs'

11    counsel.

12         MR. LECHNER:  Yes.  Ira Lechner, class

13    counsel, counsel for Plaintiffs.  I'd like to

14    introduce Robert Brownlie, co-class counsel from

15    California.

16         THE COURT:  Very well.  Welcome, Mr.

17    Lechner, Mr. Brownlie.

18         MR. BROWNLIE:  Good afternoon, Your Honor.

19         MS. STERN:  Good afternoon, Your Honor,

20    Hillary Stern for the United States.  And with me at

21    counsel's table I have Patti Smith from the Veterans

22    Administration -- Department of Veterans Affairs.

23         MS. SMITH:  Thank you.

24         MS. STERN:  And Garrison (ph) Hunter,

25    formerly of the VA but still consulting.

1          THE COURT:  All right.  Very well.  Welcome.

2          MS. SMITH:  Thank you.

3          THE COURT:  I guess we've been at this so

4    long that it might have even changed its name in the

5    interim.

6          MS. STERN:  Yes, it's undergone a few

7    permutations and I'm trying to keep up.

8          THE COURT:  Very well.

9          Okay, Mr. Lechner, if you'd like to begin.

10          MR. LECHNER:  Thank you, Your Honor.  I'll

11    be very brief.  We've briefed it very extensively.

12    This is a fair settlement.  It's a reasonable

13    settlement.  The net result of the settlement is that

14    the Plaintiffs and all of the claimants, there are

15    44,019 eligible claimants.  There are 58,000 people

16    who actually filed a claim.  About 18,000 were

17    declared ineligible for various reasons.

18          THE COURT:  Well, 15,000.  It was 14,000

19    something I think.

20          MR. LECHNER:  Something like that.

21          And we are in the process of giving all of

22    those people an opportunity to prove their eligibility

23    through official documents if the administrator will

24    help.

25          THE COURT:  So the administrator will have

1    somebody in the form of an ombudsman?

2            MR. LECHNER:  Yes, they've already hired

3    one.

4            THE COURT:  And that person will then review

5    the records that are presented and see if there's any

6    merit to their claim that they also were entitled to

7    money and if they can demonstrate that to the person's

8    satisfaction, then they will get whatever their

9    portion would have been from the full settlement from

10   the 5 percent or so that's being held in contingency.

11           MR. LECHNER:  Correct.

12           THE COURT:  And anything that's left over at

13   the end after administrative costs and any additional

14   payments out of the contingency fund then would be a

15   supplemental distribution to everybody on the same

16   sort of prorated distributional basis based on what

17   their actual ones would have been.

18           MR. LECHNER:  That's correct, Your Honor.

19           I've been through this a number of times and

20   the administrator is very, very experienced and has

21   done this work.  It's a big firm in Portland, Oregon.

22   And done this work worldwide in a number of class

23   actions and I believe they also represented all the

24   people worldwide who recovered the assets that the

25   Nazis took during the 2nd World War.  You can imagine

1    having to find people's heirs and relatives after that

2    period of time.

3         So their work will take well over a year

4    probably because you have so many variables.  One

5    variable is that there are people who are divorced and

6    there are inevitably some conflict over who gets what.

7    People die, have died.  And then we have a number of

8    conflicts sometimes between heirs and establishing

9    their rights, and state law gets involved in each one

10   of those cases.  And then you have the 14,000 or so

11   ineligibles on the surface who will have an

12   opportunity to produce records.

13        The VA has a very robust system --

14        THE COURT:  Now if I could ask?

15        MR. LECHNER:  Yes, Your Honor.

16        THE COURT:  Have those 14,000-some-odd

17   people already been notified that their claim was

18   found initially ineligible?

19        MR. LECHNER:  Not yet.  We wanted to make

20   sure that the Court was going to approve the

21   settlement before we did that.  But it's all set up to

22   do that very promptly.

23        The VA, to its credit, has a very robust

24   system whereby current employees and former employees

25   can get their pay records going back a number of

1    years.  This is not the case in most government

2    agencies, but the VA has a very good system for doing

3    that.  Current employees can go through a firewall and

4    be able to do that online very quickly.

5         THE COURT:  Through a firewall sounds like

6    it's not legal.

7         MR. LECHNER:  Well, no, it's a firewall to

8    protect those records.

9         THE COURT:  Okay.  So they're allowed to do

10   it.

11        MR. LECHNER:  Right.  Yes.  It's to protect

12   those records from disclosure.

13        THE COURT:  So they're allowed to open one

14   of these internet doors that has a little lock in the

15   corner that presumably makes it secure and nobody else

16   can go through and see what they're doing.

17        MR. LECHNER:  Correct.  Yes.  That's right.

18        Former employees can also do it.  It's a

19   little more difficult for former employees to do it,

20   but they can do it.

21        THE COURT:  Hopefully none of this

22   information was on those laptops that were lost five

23   or six years ago.

24        MR. LECHNER:  I hope not.

25        In other federal agencies, they would have

1    to go to the Personnel Records Center in St. Louis I

2    believe where there must be a warehouse half the size

3    of the county in St. Louis which has every single pay

4    record from every employee and all that. But there is

5    a way to get this all done, and in the VA, it's easier

6    than most.

7              THE COURT: Now I take it that there is some

8    plan in place by the administrator to notify the

9    people efficiently and give them the information that

10   they need and allow them -- they'll be able to go and

11   check these records and presumably each of these

12   individual class members who are ineligible for money,

13   at least apparently ineligible we'll say -- the people

14   that have been identified --

15             MR. LECHNER: Presumptively --

16             THE COURT: -- presumptively not owed any

17   money, that each of those records had actually been

18   looked at by somebody at VA and probably in

19   consultation with your consultants, whoever was

20   working on this, to identify look, this is a person

21   who doesn't have any of the applicable shifts or this

22   is a person who left work prior to 1997. So persons

23   in a different category of jobs than the jobs that

24   we're talking about so that presumably that's all been

25   done for each of those.

1    MR. LECHNER:  Very sophisticated computer

2    technology developed two years through the VA.  We

3    worked very patiently with the VA during that whole

4    process to analyze all those records and that's how

5    that got done.

6    THE COURT:  But of course any one of these

7    people, it might end up being the case that for any

8    given person that maybe a code at one point was

9    entered wrong for them and that they were in the right

10   job class -- they were class 11 in the wrong job and

11   they'd have to go and explain that and do further

12   investigation into it, but it wouldn't have been

13   feasible to do it for all 14,000 people up front since

14   you don't know which one would have fallen into that

15   sort of category.

16   MR. LECHNER:  Right.

17   THE COURT:  So it's going to be up to the

18   individuals to come in and figure that out and

19   demonstrate that there was some error.

20   MR. LECHNER:  Correct, Your Honor.  I've

21   spent a considerable amount of time developing a

22   template letter that very carefully explains their

23   rights and very carefully explains to them how they

24   would go about doing that, and with the advice and

25   consultancy of former VA employees, we've laid out the

1    computer process whereby a person can go in, whether

2    they be a current employee or a former employee, to

3    acquire those records.  And because we're not talking

4    about something that has to be done immediately, we're

5    going to give them 60, 90 days to reply.  And then if

6    they say they want more time, we'll be happy to give

7    them more time because this takes an enormous amount

8    of time by the administrator anyway.

9         The administrator as well, Your Honor, has

10   to withhold taxes, state, local --

11        THE COURT:  Withhold taxes, make the

12   payments, send 1099s or something like that to each

13   person?

14        MR. LECHNER:  So it's a very elaborate

15   process with that many people.  And they're very

16   equipped to be able to do that and they will.

17        And that's why we set aside 5 percent, which

18   is very standard in these kinds of cases.  It's a

19   large amount of money in this case because there's a

20   large settlement.  But we wanted to be on the safe

21   side so that in the event that enough people qualified

22   for reimbursement as a second distribution, there will

23   be enough money to pay them and then if there is money

24   left over, the administrator then will issue everyone

25   else a supplemental check in proportion to the amount

1    that they originally got.

2            And that is another key in this settlement
3    and why it's fair, Your Honor, is that unlike many
4    other settlements where people get an equivalent sum
5    across the board, divvying up the amount on a pro
6    rata, proportional basis but not with respect to the
7    actual amount owed.  In this case, by virtue of the
8    hard work that the VA has done, and they've hired
9    outside consultants as well as internally over this
10   two-year period of time, and they've really been
11   careful about analyzing every single claimant's record
12   by computer and therefore they will turn those records
13   over to the administrator upon approval of the
14   settlement, and the administrator will then use those
15   records, all in computerized form of course, to be
16   able to fashion exactly the proportion that every
17   single person should get after the deduction of fees
18   and expenses that were approved.

19           THE COURT:  Yes.  I was very impressed with
20   your ability to do that with this.

21           MR. LECHNER:  Well, thank you.

22           THE COURT:  That was a very important
23   feature of something like this.  Because of the amount
24   of time that the case had gone on, you might be
25   dealing with some people who might have had a decade's

1  worth of pay and other people who might have only been

2  a couple of months, and to have everyone share equally

3  under those sort of circumstances would not have been

4  fair to a lot of the longer-serving employees at the

5  VA.

6          MR. LECHNER:  And if Your Honor will recall,

7  in your opinion, you noted that we were dealing with

8  people in a whole range of job classifications and

9  they had an enormous range of pay over this 17-year

10 period.

11         THE COURT:  On the hybrids alone, there must

12 have been a couple dozen different job descriptions.

13         MR. LECHNER:  Yes.  Right.  Very difficult

14 to be fair to everybody if we would simply just divide

15 the amount of money pro rata.

16         And this is why as well that we argued in

17 the briefs that the percentage attorney's fee that is

18 called for is fair because everybody pays their fair

19 share of the fee based on those percentages that are

20 allocated to each person, so that rather than have

21 people paying a flat sum as a percentage of fee in

22 effect through the common fund, everybody pays a

23 proportional share through the common fund.

24         THE COURT:  Now let me make sure I

25 understand the calculation of the fund amount.  My

1    understanding, and correct me if I'm wrong, is that

2    the fund amount represents the total amount of back

3    pay plus interest that was owed for the 44,019 or

4    whatever it was people that were found eligible based

5    on the government's calculations, based on the pay

6    records, which I guess someone confirmed or you

7    verified.

8         And then that came up with a total, the

9    number, the total amount of the government's exposure

10   for back pay and interest.  And then what was settled

11   upon was a fund that would be equal to 80 percent, so

12   there's a 20 percent discount for the litigation risk.

13   And obviously there was great litigation risk that

14   continued.  Even if my opinion was correct and well

15   written, there's no guarantee that I would not have

16   been reversed on appeal or that some other sort of

17   complications may have come up with it, some issue may

18   be injected, that nobody had anticipated that there's

19   maybe a jurisdictional issue that the Federal Circuit

20   would pluck out of thin air and use.  So really

21   there's always some uncertainty on that.

22        Plus, with 44,000 people, even if we had the

23   greatest of pay records kept by the government in the

24   world, the amount of effort that would have needed to

25   have been done to try the case and the amount of time

1    that would have been taken up by the lawyers on both

2    sides and the Court.  Even if we took 10 minutes per

3    person and had to just go through their things and

4    verify some numbers, 10 minutes per person times --

5    that would be 440,000 minutes.  That would be 7,000

6    hours?  So, if we did 12 hours a day all week, 60

7    hours a week, we'd have to have like 12,000 weeks, I

8    don't know what that is, like 240 years or something.

9    It could have taken us 240 years worth of Court time

10   to do it individually.

11        MR. LECHNER:  In addition, Your Honor, the

12   discovery --

13        THE COURT:  Or you could have found 240

14   different people to parcel it out  -- 240 special

15   masters could get it all done in a year if they don't

16   do anything else.

17        MR. LECHNER:  In addition, the discovery

18   aspects of it would have been incomprehensible.

19        Yes, Your Honor, you've analyzed it exactly

20   the way it occurred.  And the VA presented me with

21   very precise numbers with respect to the amount of

22   interest owed in various classifications, the amount

23   of weekend exposure, the amount of night exposure.

24   What it all amounted to was $92,488,389, and then,

25   after negotiation, extensive negotiation over many,

1    many, many months, we agreed to 80 percent.

2           And this, not to belabor the point, Your

3    Honor, with respect to the attorney's fee, the amount

4    of interest owed to this group discounted 20 percent

5    to reflect the amount of interest owed on the amount

6    of principle owed to each one of these 44,019 people

7    exceeds by over $4 million the amount of the

8    attorney's fee that is requested.  Each one of the

9    individuals involved will receive approximately 85

10   percent because there's interest added to the back

11   pay, closer to 85 percent of the actual back pay owed

12   to them from the beginning of the claims period, which

13   goes back to 1995, until June 30, 2012, so that they

14   come out pretty whole in terms of the amount of

15   actual --

16          THE COURT:  Although the actual back pay

17   owed in nominal terms, but the law also, if they've

18   demonstrated that they were owed back pay, the law

19   also entitles them to the interest.  You can also say

20   that they get 170 percent of half of the back pay that

21   they were owed, but I'm not sure leaving out a portion

22   of the damages that would have been oweable to them

23   had they went to trial and prevailed is a terribly

24   productive way of looking at it, but I understand your

25   point.

1    MR. LECHNER:  You understand the point and
2    it would have engaged in another set of litigation
3    with respect to the Back Pay Act, which is of course
4    no little act.
5    THE COURT:  Now let me ask you a question
6    about that because I know that the Back Pay Act has as
7    part of it what seems to be a good attorney fee
8    shifting provision from the perspective of plaintiffs
9    until you actually look at the Federal Circuit's
10   interpretation of it, in which case one finds that the
11   "which" blah, blah, blah, language that qualifies the
12   reasonable attorney's fees award to meet the 7701(g)
13   provision doesn't just apply in the two discrete areas
14   that are naturally mentioned in the text but because
15   of the wonders of legislative history applies to any
16   fee award, in which case then we would have had to
17   find things like it was wholly without merit so that
18   the likelihood of fee shifting had you had to go to
19   trial on the damages and succeed in an appeal to the
20   Circuit wasn't that great.
21   MR. LECHNER:  No, and would have engendered
22   a whole bunch of extra litigation.
23   Finally, Your Honor, I think that it's fair
24   to say that the class here overwhelmingly approves not
25   only the settlement but the 30 percent fee that is

1    requested, and that's based on really three different

2    factors.

3         The first is that each of the claimants

4    themselves agreed when they filed their claim that the

5    attorneys for the class would seek a 30 percent fee

6    based on contingency that they were engaged in the

7    litigation on.

8         Secondly, we sent the notice, Your Honor's

9    approved notice recently of this hearing and of the

10   settlement to not only the 44,000.  We sent it to

11   everybody because I wanted to be sure that everyone

12   would have an opportunity to review that and not be

13   able to say well, I was presumptively eliminated by

14   the VA, but I really was entitled to back pay and I

15   didn't get notice.  So I made sure that the

16   administrator sent the postcard to everybody.  The

17   postcard referred each and every person to the

18   website.  The website had the settlement agreement in

19   full, had our briefs in full with respect to approval,

20   with respect to attorney's fees, et cetera.  And of

21   those people, all of them, that 58,000 people who got

22   that notice, there was only one person who filed an

23   objection and that person does not object to the fee

24   per se, but rather her objection is that the

25   government should pay the entire fee.

1          So I think that it's fair to say that under

2    the circumstances you have clear evidence --

3          THE COURT:  Which was why I asked about the

4    Back Pay Act.  It seems that under the Back Pay Act

5    the ability to shift the fee to the government, it

6    seems even harder than under the Equal Access to

7    Justice Act.  This would displace the Equal Access to

8    Justice Act.  The Equal Access to Justice Act has one

9    deep qualification in it, that you have to figure out

10   the net worth of each individual for purposes of the

11   thing and then you've got the substantially justified

12   standard there, which seems to me a much tougher

13   hurdle.

14          The interest of justice standard under the

15   fee shifting one of the Back Pay Act seems to be at

16   least on first glance a much more difficult hurdle to

17   meet so that the objection of the one individual, Ms.

18   Keith, to the notion that the government's not

19   separately paying this fee would have I think less

20   resonance since it could have been difficult to have

21   the fee shifted.

22          MR. LECHNER:  Correct.

23          THE COURT:  And even if the government had

24   agreed to -- even if you would have settled otherwise

25   for 79 percent of the thing and added it, made it 80

1  because -- the money's still ultimately going to be

2  coming out of the fund anyway in roughly the manner

3  that you were suggesting.

4        MR. LECHNER:  And the fee, Your Honor, as

5  well, the notion of a common fund principle is really

6  not the same as the notion under the Back Pay Act for

7  the fee shifting which --

8        THE COURT:  If we had gone to trial and had

9  damages in the form of a common fund somehow, if we

10 had come up with some sort of a statistical sampling

11 of the records of the people in the class and then

12 projected based on that the amount of money that was

13 due, even if the Back Pay Act fee shift came into

14 account, that would not be a limit on how much the

15 attorneys would receive.  That would be added to the

16 pot, but the amount that the attorneys would receive

17 would be whatever that would have been anyway.

18        MR. LECHNER:  Right.

19        THE COURT:  So, if you would have gotten 30

20 percent of the pot, the pot might actually be a little

21 bigger when that's thrown in, but you would get the 30

22 percent as opposed to the part that was thrown in or

23 as opposed to the part that was thrown in plus some

24 percentage of the rest, I mean, it would all go into

25 the common fund because the attorney fee award is

1   nominal to the party.  And then it will come out of

2   that, so I can understand what you're saying.

3            MR. LECHNER:  Judge Bruggink addressed this

4   in the <u>Moore</u> case.  And, Your Honor, Judge Braden, I'm

5   sure you're aware, a week ago approved a settlement

6   virtually identical in terms of the language against

7   the VA in a case called <u>Adams</u> which was published and

8   approved a 30 percent common fund in that case as

9   well.

10           So I'd like to close if I might by

11  complimenting opposing counsel.  Opposing counsel were

12  very diligent, great expertise and professionalism.  I

13  worked very closely with them and with their team over

14  a very lengthy period of time to develop this entire

15  template and the calculation of damages and

16  negotiating a settlement that we both felt was fair,

17  was reasonable and was within the standards set by the

18  Court with respect to common fund recovery.  And so I

19  think that's the bottom line.  The bottom line is that

20  the settlement itself is fair and reasonable and

21  deserves to be approved.

22           May I just add one last feature?  And that

23  is that the payment of the amount of money to the

24  administrator is done by the judgment fund over at the

25  Treasury Department.  The experience, Your Honor, is

1      that that's sort of like a bakery line in the sense

2      that as the due bills come due to the Treasury either

3      in terms of judgments or in terms of settlements or in

4      terms of contractor disputes or however it comes,

5      there's an order to it.

6            And fortunately we are at the very beginning

7      of the fiscal year, the fiscal year having just begun

8      earlier this month, and as a result, the number of due

9      bills that are at the Treasury Department are very few

10     and so the bakery line at the moment is very small,

11     which gives us an opportunity and we appreciate

12     greatly the Court's promptness in scheduling this

13     hearing, that if the Court were able to issue an

14     opinion approving the settlement and the fee by the

15     end of the month or thereabouts, we would have an

16     opportunity to pay these people before Christmas this

17     year because of the ability to get the money out of

18     the Treasury Department, and because all of the back

19     pay for these 44,000 people is computerized, the

20     administrator is already set up to be able to apply

21     the percentages, et cetera, and be able to begin that.

22     So there is a chance that we could get in before

23     Christmas, and after 17 years of having their claims

24     outstanding, we'd appreciate the opportunity to do

25     that.  We thank the Court very much.

1          THE COURT:  Thank you, although I wonder how

2     these things would work.  I presume that the money

3     received by these individuals would be taxed at the

4     individual tax rates that apply at the time as opposed

5     to going back to whatever the tax rates were in '95 or

6     '96 or whenever the money would have been effectively

7     owed, right?

8          MR. LECHNER:  The administrator I don't

9     think actually taxes each person on their own tax rate

10    but rather has a standard and withholds that amount,

11    and so it could be in some cases it's too much and in

12    some cases too little, but that goes into that.

13         THE COURT:  So, if they don't get it by

14    Christmas, in January the tax rate they face could be

15    much higher.

16         MR. LECHNER:  That could be true, yes.

17         THE COURT:  And we're imagining that it was

18    paid on the effective rates of 10 years ago.

19         MR. LECHNER:  Well, averaging went out a

20    number of years ago in the IRS Code, so you pay the

21    tax rate on the year in which you receive it.

22         THE COURT:  If I can ask just one or two

23    questions just very briefly.

24         MR. LECHNER:  Yes.  Sure.

25         THE COURT:  I don't think that we'll have

any problem at all approving the settlement agreement. It does seem, given litigation risks, I think settling the 80 percent of the exposure is a reasonable thing even though I've yet to be reversed by the Federal Circuit, but we don't want to make this the first.

MR. LECHNER: We don't want to try.

THE COURT: That's fine. And obviously I think class counsel has been very adequate and done an excellent job in this case and all the companion cases. There are various permutations of this.

In developing the law in the Federal Circuit they were applying in the first place, I think that it's significant that we only had one objection at least that we know of. We didn't know from the clerk's office that that actually had been received because I think there was some confusion when it was received. We weren't told even though we were calling them every day. They didn't know what that was until a week ago. I do think it's very fair. It does appear very fair to the whole class by the proportion, the way in which the money is going to be distributed.

One question I had about the settlement agreement, and obviously the settlement agreement doesn't determine the attorney fees. That's a separate -- the settlement agreement doesn't -- it

1   says that it will apply for 30 percent, but that's not

2   approval.  That is different than approval of

3   attorney's fees.  But there's nothing there that

4   seemed to be problematic.

5        But one question I have is that there was

6   one provision in the settlement agreement that stated

7   that the Court retains continued jurisdiction over the

8   case I believe, until the payment is satisfied or

9   until the terms of the settlement were satisfied, I

10  think it was paragraph 17.  And what I was wondering

11  is I'm not sure what exactly that would mean because

12  we would have to enter judgment when we approved the

13  settlement, we would have to enter judgment dismissing

14  the case on prejudice based on the terms of the

15  settlement, right?  So the case would be closed, but

16  you're just making it clear to the Court that we would

17  be the forum they would come to if there were any

18  problems.

19       MR. LECHNER:  Yes, Your Honor.  I think the

20  reason that we've done that in the past as well was

21  just as a protection for the Court and for the class

22  should there be any fraud involved.

23       THE COURT:  But you weren't seeking to

24  preclude the entry of judgment because the entry of

25  judgment might be necessary in order to have the order

1    to go over to have the money paid.

2              MR. LECHNER:  Yes.  That's right.

3              THE COURT:  We'll have to obviously check

4    with the clerk's office to see what special words we

5    need to use in that.  I think they know that better.

6              MR. LECHNER:  The government is quite expert

7    in handling that side of things.  Unlike in State

8    Court, Plaintiff's counsel doesn't get involved in the

9    actual drafting of the administration of the judgment.

10             THE COURT:  Okay.  So presumably there's not

11   much we would have to say other than that -- I mean,

12   obviously we have to have an opinion explaining what

13   we were doing, but at the end of the day, all we'd

14   need to do is approve the settlement and dismiss the

15   case with prejudice on the basis of the settlement,

16   and then pursuant to the settlement -- we wouldn't be

17   ordering you to pay the money.  The settlement would

18   be obligating you to do it.

19             MR. LECHNER:  Correct.  The settlement

20   agreement as approved by the Court.

21             THE COURT:  The settlement agreement as

22   approved by the Court would then be the thing that

23   would obligate you to pay.  We wouldn't be issuing a

24   judgment stating that you are ordered to pay this much

25   money to so and so.  That would be what you agreed to

1     in the agreement that we then adopted.

2          Now, on the issue of the attorney's fees, to

3     me, I mean, I do think that given the large sum of

4     money in the settlement fund, 30 percent of that is a

5     massive amount of money.  But on the other hand, my

6     general philosophy is that it really shouldn't be the

7     business of the courts or even actually any branch of

8     the government to tell you the truth to interfere with

9     whatever prices individual parties or private parties

10    agree to among themselves.  I don't think we should be

11    engaged in price controls or we should be questioning

12    bargaining power of individuals or any of that sort of

13    thing.

14         To me, the most important thing here is that

15    when parties were or when individuals were given the

16    opportunity to opt in to the lawsuit through the

17    notice that we approved, they were informed that it

18    was your intention to seek 30 percent, an attorney fee

19    equal to 30 percent of the collective fund so that no

20    individual would be paying -- unless money could be

21    somehow shifted over to the government.  So, to me,

22    that's the most significant thing.

23         Procedurally now, if people had received

24    notice of the class action and the opt-in invitation,

25    whatever we'll call it, under our rules, certainly I

1   think anybody who looked at that and thought that 30

2   percent was too high could have sought to intervene,

3   could have joined by intervening into the suit

4   themselves and had their own attorney or try to

5   represent themselves.

6         MR. LECHNER:  You gave them notice of that.

7   In your initial notice of class certification, you

8   gave them precise notice saying you have the right to

9   retain your own attorney and you will have to pay your

10  own attorney your own fee.

11        THE COURT:  And my guess is that for most

12  people the cost of the attorneys who aren't at all

13  familiar with this case probably would have been in

14  excess of 30 percent if you had a few thousand dollars

15  to recover.  So I don't think that under these

16  circumstances, although I think that 30 percent is

17  such a large sum, it's probably unprecedented in our

18  Court.  As you noted in your briefing, there are many

19  precedents for it in various courts across the

20  country.

21        To me, the most important thing really is

22  that the individuals who opted in all were notified up

23  front of the 30 percent amount and came into the suit

24  anyway and also came into the suit knowing that you'd

25  already won the liability phase and they're just

1    jumping in to try to --

2         MR. LECHNER:  And did not object to the fee

3    after given notice again --

4         THE COURT:  Again, the only objection was

5    from Ms. Keith, who wasn't objecting to the amount so

6    much as she was objecting to the idea that additional

7    money wasn't coming just from the government to pay

8    for it and that I guess she didn't review the

9    documentation, so she didn't know that the fee, the

10   other costs were going to be less than a percent.  She

11   thought they could have been 30 or 40 percent.

12        So I don't believe that there will be any

13   problems with it, but of course we'll review very

14   carefully this, but I'm satisfied that it appears to

15   be, at least as I see it right now it seems to be fair

16   and reasonable in all respects.

17        MR. LECHNER:  Thank you, Your Honor.

18        THE COURT:  I commend you for your work.

19        Ms. Stern, do you have anything you want to

20   add?

21        MS. STERN:  I'll be very, very brief, Your

22   Honor.  The government obviously feels that this

23   settlement is fair and reasonable both for the

24   Plaintiffs as well as the government.

25        I do think that the --

1          THE COURT:  You don't want to spend 240

2     years trying the damages.

3          MS. STERN:  No, thank you, Your Honor, with

4     all due respect, even if it was all in front of you.

5          I do think the most remarkable thing about

6     this case is the process that the VA, I really give

7     tremendous credit to the VA, I'm so glad that both

8     Garrison Hunter and Patti Smith are both here today

9     because the VA worked so hard to develop this

10    methodology, this computer program for determining the

11    precise calculations.  In every case that I've been

12    involved in at the Justice Department and even other

13    ones that have been handled in my office that I'm

14    familiar with, there's always been sort of a formulaic

15    way of determining damages.  But in this case, for

16    this number of Plaintiffs, to be able to calculate

17    with such precision actual damages and I think we did

18    describe this to the Court as we were going along, but

19    in the development of this program, which we call the

20    template, a statistically acceptable sampling of

21    individuals, their damages were computed both using

22    the template and by hand so that individuals actually

23    looked at records and calculated by hand and then

24    compared that to the results of the template to bring

25    the template to within, I mean, it wasn't 100 percent,

1    but it was 99-point whatever.  It was statistically

2    acceptable.

3         So although I guess it's always possible,

4    and I never say never, that some individual could come

5    forward and identify some error, it would be highly,

6    highly, highly unlikely given the rigorous testing

7    that it was subjected to by the VA and also by the

8    independent consultant that the government retained

9    who if he was here I would compliment him also, but he

10   did a fabulous job.  So I think that is really the

11   most remarkable aspect of this settlement.

12        THE COURT:  Although 1 percent of the 14,000

13   people could still be --

14        MS. STERN:  I'm trying to remember exactly

15   whether it was .1 percent or -- I don't remember the

16   exact, but it was --

17        THE COURT:  One percent of 14,000 people

18   could be as many, it could go over 100.  But there's

19   ample resources for the administrator to work through

20   that and figure it out.

21        MS. STERN:  And the benefit obviously of

22   using the computer program, when you were calculating,

23   Your Honor, the amount of time it would take if we

24   tried all these cases, I was imagining in my head the

25   amount of time it would have taken to actually

1    calculate damages for each of these individuals.

2    Suffice it to say that many of them would be no longer

3    living by the time we finished.  So obviously the

4    benefits of using this computer program, and again all

5    credit to the VA for doing that.

6              And the only other thing that I would add,

7    when it comes to the attorney fees and the fee

8    shifting, I think Your Honor is absolutely right.  My

9    experience, and I've litigated both the Equal Access

10   to Justice Act and the Back Pay Act fee shifting

11   provisions, and the Back Pay Act provisions are much

12   tougher.  So I believe the likelihood is that the

13   Plaintiffs would have ended up bearing the burden of

14   paying attorney fees out of their recovery.

15             And for all the reasons stated by my

16   colleague, we believe this settlement as well as the

17   attorney fees are fair and reasonable and should be

18   approved by the Court.

19             THE COURT:  Okay.  Thank you, Ms. Stern.

20             MS. STERN:  Thank you.

21             THE COURT:  I want to make sure there's

22   nothing else that I need to ask you about.

23             The amount of hours that Mr. Brownlie and

24   yourself spent on the case was thousands of hours.

25             MR. LECHNER:  Absolutely, Your Honor.

1           THE COURT:  A very large amount of time.

2           MR. LECHNER:  And we're likely to spend a

3    considerable amount of time dealing with the potential

4    of objections and resolution of divorces and heirs

5    beyond that.

6           THE COURT:  And you won't receive any more

7    from the fund for that.

8           MR. LECHNER:  No.  No, we won't.

9           THE COURT:  And you have to give a big

10   portion of this amount to your law firm or former law

11   firm?

12          MR. LECHNER:  We have to divide it among

13   many people, including the United States, who gets

14   about half the money back.

15          THE COURT:  Maybe even more if we don't get

16   this resolved before Christmas.

17          MR. LECHNER:  That's true.

18          THE COURT:  Talk about fair share and all.

19          Okay.  Well, as I said, my inclination from

20   looking at this and hearing you speak about it is that

21   it all appears to be fair and reasonable.  I think it

22   is significant -- in fact that I think it's more

23   significant that we received one objection than if we

24   received none because this at least demonstrates that

25   some people have found out about the thing and the

1    only objection we had while well-meaning I think

2    wasn't particularly persuasive.

3    I suppose if I had received a handful of

4    objections from people who made a very strong case as

5    to why from a recovery of this size the fee should be

6    limited to 20 percent or something like that, even if

7    I wasn't persuaded that that would be sufficient to

8    reduce the award overall, I suppose that since the fee

9    judgment is separate that we probably could have

10   altered the fee to be 30 percent except to the extent

11   that those five people and only 20 percent for those

12   five, to the extent that it relates to those five

13   people share something like that, but under these

14   circumstances, we didn't receive any objection dealing

15   with any specific amount of fee and explaining that a

16   lower rate would have been warranted.

17   And frankly, as I said, under these

18   circumstances where they were told up front that

19   you're anticipating seeking 30 percent of the fund as

20   payment in attorney's fees, it's hard to say that they

21   didn't consent to it as part of the deal.

22   MR. LECHNER:  In addition, Your Honor, if I

23   might, the administrator catalogs the number of hits

24   on the website.  All of these documents are there.

25   The number of hits if I remember correctly is over 3

1   million hits on the website since your first opinion.

2   So the class is very active.  I can assure the Court

3   that I receive countless number of phone calls and

4   emails from the class.  These are very intelligent

5   people who have advanced degrees and they've been

6   following it very carefully.

7          THE COURT:  Did you have a Facebook page and

8   a Twitter account?

9          MR. LECHNER:  No, but that website was very

10  popular.

11         THE COURT:  So you didn't use those social

12  media.

13         MR. LECHNER:  No, sir.

14         THE COURT:  They discourage us from such

15  things, although it doesn't stop guys like Posner and

16  Kazinski.

17         Okay.  Well, I think that I have all the

18  information I need.  And as I said, I suspect that

19  before too long you'll receive the opinion approving

20  the settlement and approving the attorney's fees

21  motion because there's nothing that I see that would

22  seem at all indicate it's not fair and reasonable and

23  just under these circumstances.

24         But I do want to commend the attorneys on

25  both sides for their diligent work at this.  We've

1    been going at this for a very long time.  This is one

2    of I think maybe more than there should be, but I

3    think one of the handful of cases that I've had from

4    the beginning of my tenure on the Court, although it

5    preexisted me and I think went back to some other

6    Court originally.  Was it filed in California or --

7                MR. LECHNER:  Judge Baskir.

8                THE COURT:  But it was filed also in the

9    District Court and the District Court transferred it?

10               MR. LECHNER:  Oh, filed in the District

11   Court originally.  Yes.

12               THE COURT:  So anyway, I do appreciate the

13   hard effort that was made by both sides and the amount

14   of time that was invested to do this.  We do

15   appreciate the economies and efficiencies that are

16   created by avoiding a trial with 44,000 individual

17   claims.  So, under the circumstances, I think you

18   should all be commended for a job well done.

19               MS. STERN:  Thank you, Your Honor.

20               THE COURT:  And thank you.

21               I don't know if we'll see you again.  We'll

22   see Ms. Stern, I'm sure.  I'm not sure if we'll see

23   you again before too long if you're going to retire

24   after this one, but I do want to say that I do

25   appreciate working with you all and judging this

1    matter.  I will hopefully ensure that people receive

2    or have the possibility of receiving their payments by

3    Christmas.

4              MR. LECHNER:  Thank you, Your Honor.

5              MS. STERN:  Thank you.

6              THE COURT:  Again, thank you.  With that, we

7    are adjourned.

8              THE CLERK:  All rise.

9              (Whereupon, at 2:45 p.m., the hearing in the

10   above-entitled matter was concluded.)

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

<u>CERTIFICATE</u>

DOCKET NO.:  02-101

CASE TITLE:  Yolanda Quimby, et al. v. U.S.

HEARING DATE:  October 18, 2012


   I certify that the foregoing is a true and
correct transcript made to the best of our ability
from a copy of the official electronic digital
recording provided by the United States Court of
Federal Claims in the above-entitled matter.


        Date:  October 19, 2012

_____

         Marcia Thurmond

   Heritage Reporting Corporation

          Suite 600

      1220 L Street, N.W.

    Washington, D.C.  20005-4018